## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **MICHAEL HART,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | **12-11217-FDS** |
| **MCI CONCORD SUPERINTENDENT,** ) | |
| ) | |
| **Respondent.** ) | |
| _____) | |

## MEMORANDUM AND ORDER
## ON PETITION FOR HABEAS CORPUS

**SAYLOR, J.**

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 by a person in state custody. Petitioner Michael Hart was convicted of one count of first-degree murder and two counts of assault in Massachusetts Superior Court on April 2, 2007. He was sentenced to serve a term of life imprisonment on the murder conviction, and concurrent terms of nine to ten years' imprisonment on the assault convictions. He now seeks habeas relief pursuant to 28 U.S.C. § 2254.

For the reasons set forth below, the Court will deny the petition.

## I.     Factual Background

### A.     Events of April 30, 2005

On the evening of April 30, 2005, at 11:09 p.m., police officers responded to a call at 9 Millet Street in the Dorchester section of Boston. The police found the body of Beother Billingslea on the hallway floor near the door to the front porch. Billingslea was transported to a nearby hospital, where he was pronounced dead as a result of multiple stab wounds. A

toxicology screen revealed that Billingslea had both alcohol and cocaine in his blood, but neither contributed directly to his death.

Upstairs at 9 Millet Street in Billingslea's apartment, police found a woman named Tangela Gibson. Gibson was covered in blood and was bleeding from a wound in her neck. One officer used his radio to request an ambulance; another placed a towel around her neck in an attempt to control the bleeding. Gibson told the police that her former boyfriend, Michael Hart, had stabbed her. She told police where he lived and described his clothing. Gibson was transported to a nearby hospital and survived her injuries.

Gibson had known Hart since she was a teenager, and they started a relationship in 2004. At some point, Gibson lived in Hart's home on Holiday Street in Dorchester, where he lived with other members of his family. Gibson had a long-standing cocaine problem, which Hart did not like. Gibson also had an extensive criminal history, including convictions for armed robbery, breaking and entering, assault and battery, and possession of cocaine. Hart and Gibson did not always maintain an exclusive relationship. Michael Ferguson also spent time with Gibson; Hart was aware of that fact, but did not like it. Gibson and Hart argued about her use of drugs and her visits to her "old neighborhood." The arguments occasionally became physical. Hart had slapped, choked, and punched Gibson.

On April 29, 2005, Gibson grew tired of Hart beating her and broke up with him. At approximately 8:00 p.m. the next evening, she visited Billingslea, who was a friend, in his second-floor apartment in a three-story house on 9 Millet Street, about one-half mile from the defendant's home. Gibson had arranged to meet Ferguson at Billingslea's apartment to get drunk and high. Sometime after 10:30 p.m., Ferguson left, and Gibson followed him downstairs

to the porch.  At approximately 11:00 p.m., Gibson was still on the porch when she was attacked

with a knife, allegedly by Hart.  According to Gibson, Billingslea at some point came

downstairs, became involved in the alleged altercation, and was eventually stabbed by Hart.

Hart was indicted on charges of murder in the first degree of Billingslea on a theory of

deliberate premeditation, assault and battery of Gibson by means of a dangerous weapon, and

armed assault with intent to murder Gibson.  He was tried in late March and early April 2007 in

Suffolk Superior Court.

**B.**  **The Trial**

Hart's principal defense to the charges was alibi; he contended that at the time of the

assault and murder, he was at the home he shared with his mother.  Hart's counsel, John Miller,

called two alibi witnesses—his mother's long-time friend, Maija Leville, and his nephew, Robert

Jammaul Vann.  Defense counsel had met with these witnesses prior to trial and told them that

he would give the information that they told him to the prosecution on their behalf.  He also told

them that the only thing they needed to do was to testify truthfully at trial if summoned.  Finally,

he told them that "there could be no benefit" in them talking to the police and that, if they did

speak to the police, "the police would take isolated portions of what they said and beat them over

the head with these isolated and out-of-context portions when they testified."  (Miller Affidavit).

Neither Leville nor Vann spoke to police after receiving this advice, despite multiple attempts by

police to contact them.

At trial, Leville testified that she was visiting with Hart's mother in their home on the

night of April 30.  Leville further testified that at approximately 11:00 p.m., she looked at the

clock in the kitchen and remarked that it was time for her to leave; about ten minutes later, Hart

3

came downstairs and walked Leville to the door.  She testified that as she drove off, she noticed that the clock in her vehicle read 11:15 p.m.  Vann testified that he was on the front porch of the Hart household on the night of April 30, and observed Hart escort Leville to her vehicle late in the evening.  Vann testified that Hart then left briefly to buy cigarettes and returned to smoke one with him.  Hart's testimony was consistent with that of the two alibi witnesses.

The prosecution attempted to impeach the two alibi witnesses by eliciting testimony about their pretrial silence.  In substance, the prosecution suggested that their decisions not to speak to the police about Hart's whereabouts once they knew he was charged with murder indicated that their exculpatory testimony was falsely contrived after the fact in an attempt to keep their loved one out of jail.  When asked why they did not come forward to the police or return police detectives' phone calls and text messages, the witnesses responded that they "didn't want to."  (Tr. Trans. Vol. 6 at 101:9, 114:9).  No testimony was elicited as to the advice given them by attorney Miller, nor did Miller request a sidebar conference to address the issue or reveal the advice he had given the witnesses to the court.

In addition, the prosecution introduced audio recordings of two telephone calls made by Hart to his sister while he was incarcerated awaiting trial.  The first conversation went as follows:

HART:        Jack [the defendant's attorney] told me, you know, about his interview with [Vann] and [Leville], you know, so, I, I was glad of that, too, you know.

SISTER:      Yeah. Yeah.  Oh, he talked to [Vann].

HART:        Yeah, he told me.  That's what I'm saying.

SISTER:      Oh, okay, because last time I talked to him he hadn't quite caught up with him yet.

HART:           Yeah, yeah, I talked to him, uh, what's today, Saturday? I talked
                to him on Monday, as a matter of fact -- no, Tuesday. Yeah, he
                said that he had just finished talk[ing] with [Leville], you know.

SISTER:         Yeah. So what he talking about?

HART:           Ah, you know. They're straightening it out. I don't wanna go into
                detail on this damn phone, you know.

The second conversation went as follows:

HART:           Hey listen, but you know, ah, make sure you keep in touch with,
                ah, G and [Vann], you know, and find out what you can on that
                situation. You know, and find out what the hell is . . . What they're
                gonna do. . . .

SISTER:         Oh, we know what time it is. Ain't nobody stupid. We know what
                time it is. But in any event, I, I hear that they're gonna talk to
                [Leville] again on the twenty-third.

HART:           Oh yeah?

SISTER:         Yeah, the uh, Jack and the DA or somebody or another. She said,
                "Look, I know that he didn't do it. [I] know that at 11:09 he was at
                the house."

HART:           Yeah, I remember her and mom sitting at the table.

SISTER:         Uh-huh, and that's what she told them.

At the close of trial, the government, in closing arguments, made the following remarks

to the jury:

Those alibi witnesses that you heard from are simply not believable. They are not
believable and here's why: because they both told you that they were aware that
this man had been charged with murder in the first degree, the most serious
charge I can imagine and yet, knowing that, when they're contacted by members
of the Boston Police, do they call them back? Do they knock on their door? Are
they sitting in their office every since day waiting to say, you've got the wrong
man. You've got the wrong man. I saw him, I know where he was, he didn't do
this. Did those people do that? Did they even call Lieutenant Merner back on the
phone? They didn't even return his phone call. Think about that when you think
about their testimony. And think, too, about the calls that you just heard, the

recorded calls of the defendant talking about conversations, conversations about those two witnesses that were here in court before you yesterday. "They're straightening it out." Ladies and gentlemen, witnesses who tell the truth, they don't have to straighten it out. They just come in here and they tell the truth.

(Tr. Trans. Vol. 7 at 60:2-61:1).

As affirmative proof of Hart's guilt, the government offered the testimony of Gibson, the surviving victim; some limited DNA evidence; a letter written from Hart to Gibson some months after the incident; and the testimony of others who were at Billingslea's apartment on April 30, including the first responders. With respect to the DNA evidence, a bloodstain on a shoe seized from Hart was consistent with the DNA profile of Gibson, and a bloodstain on pants was consistent with his own DNA profile and contained another blood source from which Gibson could not be included or excluded. There was no evidence that the shoe and pants tested were those worn by Hart on April 30. There was further evidence of footwear impressions in blood at the crime scene, which a Boston Police Department expert testified matched footwear worn by Gibson and Billingslea, but not footwear worn by Hart.

The letter from Hart to Gibson was delivered in June, and included the following:

I have to tell you that you have made a very bad miscalculation, in believing that you can act certain ways with me. I demand more . . . respect than that. Are you trying to get me caught up, and sent to a place I . . . hate . . . . I'm a grown[-]ass man. One that is not to be played with. You got it fucked up . . . . If you act like a bitch, I'll treat you like one.

(Tr. Trans. Vol. 6 at 125-127). When asked about these statements, Hart testified that he was "referring to an emotional state of mind" and "the act of addiction." (Tr. Trans. Vol. 6 at 126:14-17).

On April 2, 2007, the jury found Hart guilty on the charges of first-degree murder, assault and battery with a dangerous weapon, and armed assault with intent to murder. He was

sentenced to life imprisonment on the murder conviction and concurrent nine-to-ten-year terms on the assault convictions.

    C.      **Direct Appeal in State Court**

Hart appealed his convictions directly to the Supreme Judicial Court of Massachusetts pursuant to Mass. Gen. Laws ch. 278, § 33E.

Chapter 278, § 33E provides for a direct appeal to the Supreme Judicial Court in so-called "capital" cases (essentially, first-degree murder convictions). Under Massachusetts law, § 33E "provides for a distinct process of review by the Supreme Judicial Court." *Mendes v. Brady*, 656 F.3d 126, 128 (1st Cir. 2011). Among other things, the SJC is "not subject to the usual restrictions on the scope of appellate review when considering ineffective assistance claims"; the court "may examine any error by any trial participant," including defense counsel; and the court may "entertain motions for new trial (as for ineffective assistance) filed with it in the first instance," and "gives the parties an opportunity to put in evidence supplementing the record at trial." *Id.* at 129.

On appeal, Hart was represented by new counsel, attorney Ruth Greenberg. In that appeal, he argued, among other things, that the government's impeachment of the alibi witnesses by pretrial silence was improper because counsel had not established a proper foundation for such questions as required under *Commonwealth v. Brown*, 11 Mass. App. Ct. 288 (1981). The court in *Brown* had held that the government must "lay a foundation for this type of cross-examination by first establishing that [1] the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, [2] that the witness had reason to make the information available, [3] that he was familiar with the means of reporting it

7

to the proper authorities, and [4] that the defendant or his lawyer, or both, did not ask the witness to refrain from doing so." *Id.* at 296-297. Hart contended that the fourth element had not been established, and, therefore, the impeachment evidence should have been excluded. Because no objection was made on this basis at trial, the SJC reviewed the claim under a "miscarriage of justice" standard. *See Commonwealth v. Roberts*, 433 Mass. 45, 50 (2000).

On October 20, 2009, the SJC affirmed the jury verdict and "[found] no reason to exercise [its] power under [Mass. Gen. Laws ch.] 278, § 33E to grant the defendant any other relief." *Commonwealth v. Hart*, 455 Mass. 230, 244 (2009). In its opinion, the SJC abolished the fourth *Brown* factor, and held that "[i]f a defense witness has been requested by a defendant or defense counsel not to provide law enforcement with the exculpatory information, and the defendant wishes to preclude the prosecutor from impeaching the witness for having failed to do so, defense counsel should inform the judge before the witness testifies so that the matter may be explored at a bench conference." *Id.* at 241. The SJC further remarked, in a footnote, that "even had we not abolished the fourth foundational element, the impeachment of the alibi witnesses in this case would still not be error because there was no evidence that the defendant or his attorney had asked either Leville or Vann not to speak with the police." *Id.* at 241 n. 10.

### D. Motion for New Trial

On September 24, 2010, Hart filed a motion for a new trial in the Superior Court and an accompanying motion for post-conviction discovery and testing. That motion was initially denied, but upon reconsideration and the filing of subsequent motions, the Superior Court issued an order on January 4, 2011, allowing funds in the amount of $1,500 for the services of a forensic expert. The expert concluded that due to the copious amount of blood at the scene, if

the perpetrator had left the porch he would have left footwear impressions in blood leading away from the porch. Ten days later, after reviewing the initial expert analysis, Hart filed a request for funds for further forensic crime scene reconstruction, and for an order for additional discovery. That motion was denied on February 25, 2011, and a motion for reconsideration of the same was denied on June 20.

### E.      Motion for Leave to Appeal under Mass. Gen. Laws ch. 278, § 33E

On July 21, 2011, Hart filed a petition for leave to appeal with the SJC, seeking review of the denial of those post-trial motions.  In his petition, among other things,  he alleged (1) that trial counsel was constitutionally ineffective for "failing to do *any* forensic investigation in this one-witness case," (2) that he was denied due process by the trial court's "refusal to grant funds for further forensic expertise, given the defendant's showing that such expertise will support and confirm actual innocence," (3) that trial counsel was constitutionally ineffective "because he was burdened with an actual conflict of interest" given that "the reason that alibi witnesses did not come forward to speak to the police was because of the advice given to them by counsel."  (Pet. for Leave at 1-2).[1]  With the motion, petitioner filed an affidavit of trial counsel setting forth his conversations with the two alibi witnesses; among other things, trial counsel stated that he "did not instruct them to refuse to talk to the police, but [he] was clear that there could be no benefit in doing so, as the Commonwealth would already receive this information from me."  (Miller Aff. at 1).  Petitioner also submitted an affidavit from his forensic expert, Albert Harper, setting

---

[1]    He also indicated that it was his "intention to preserve for habeas review, if required, his claim that his trial counsel was ineffective . . . both because of trial counsel's failure to investigate . . . , and also because of trial counsel's conflict of interest in either adducing testimony from the alibi witnesses or testifying himself as to their directed failure to come forward."  (*Id.* at 3).

forth is preliminary review of the forensic evidence and estimating that a full review would require 25 to 30 hours of work.

The petition was considered under the "gatekeeper" provisions of Mass. Gen. Laws ch. 278, § 33E. That provision of the statute provides that "no appeal shall lie" from the decision of the Superior Court on such a motion (that is, a motion filed after the conclusion of the direct appeal) "unless the appeal is allowed by a single justice of the [SJC] on the ground that it presents a new and substantial question which ought to be determined by the full court."

A single justice of the SJC denied the petition on June 21, 2012. The order stated, without elaboration, that "[T]he defendant's gatekeeper petition is denied on the merits. This petition does not present a new and substantial question which ought to be considered by the full court." (Mot. to Dismiss at App. 95).

### F.    Federal Proceedings

On July 6, 2012, Hart filed the present petition for a writ of habeas corpus. The petition raises the following three grounds for review: (1) the denial of additional funds for forensic investigation violated his federal right to counsel and federal right to due process when there is a state right to counsel; (2) the "gatekeeper" provision of Mass. Gen. Laws ch. 278, § 33E limited his ability to bring ineffective-assistance claims before the full SJC, and therefore violated his federal rights to due process and equal protection; and (3) trial counsel's failure to perform forensic investigation and counsel's advice to alibi witnesses not to come forward, or the resulting conflict of interest it created, amounted to ineffective assistance in violation of the Sixth Amendment.

## II.    Analysis

### A.    Standard of Review

As a general proposition, "federal habeas review is precluded . . . when a state court has reached its decision on the basis of an adequate and independent state-law ground." *Burks v. DuBois*, 55 F.3d 712, 716 (1st Cir. 1995) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  That rule extends to situations in which "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  *Coleman*, 501 U.S. at 729-30.  A state procedural rule is "adequate" if it is regularly or consistently applied by the state courts.  *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (citing *Hathorn v. Lovorn*, 457 U.S. 255,  262-63 (1982)).  The rule is "independent" if it does not depend on a federal constitutional ruling.  *Coleman*, 501 U.S. at *741* (citing *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).  The doctrine may apply even where the state procedural default is offered as an "alternative" basis for a decision.  *Coleman*, 501 U.S. at 733.

In cases involving such a procedural default, "federal habeas review of the claim[] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  In this context, "cause must relate to an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule.  Mere attorney error, not amounting to ineffective assistance in a constitutionally significant sense is insufficient to constitute cause."  *Burks*, 55 F.3d at 717 (citations omitted).

In those cases where an independent and adequate state-law ground does not preclude review, an application for a writ of habeas corpus brought by a state prisoner "with respect to any claim adjudicated on the merits in State court proceedings" may be granted only if those proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). However, if a claim was not adjudicated on the merits in State court proceedings, then the claim should be reviewed *de novo* by the federal district court. *Clements v. Clarke*, 592 F.3d 45, 52 (1st Cir. 2010).

### B.     <u>Procedural Default</u>

The initial question before the Court is whether any or all of petitioner's claims have been procedurally defaulted. Respondent contends that the single justice's "gatekeeper" determination that petitioner's claims did not present a "new and substantial issue" sufficient to warrant review under Mass. Gen. Laws ch. 278, § 33E constituted an adequate and independent state-law ground precluding federal habeas relief. Respondent cites *Dickerson v. Latessa*, 872 F.2d 1116, 1118 (1st Cir. 1989), for the proposition that § 33E operates to prevent a so-called "capital" defendant from "press[ing] an appeal where the issues raised in his post-conviction motion were or could have been raised at trial or on appeal." *See Costa v. Hall*, 673 F.3d 16, 24 (1st Cir. 2012) (holding that "[t]he Single Justice's finding that neither of [petitioner's] ineffective assistance of counsel claims presented 'new and substantial questions' within the meaning of § 33E review constitutes an independent and adequate state ground"); *Mendes v. Brady*, 656 F.3d 126, 130 (1st Cir. 2011) (holding "that application of the new-and-substantial

rule in Section 33E cases is an adequate and independent bar to collateral relief").  Therefore,

according to respondent, the SJC's summary denial of a gatekeeper petition is effectively a

ruling that petitioner has waived his right to pursue the claims advanced in that petition.  Put

another way, respondent essentially contends that the denial of a gatekeeper petition *necessarily*

requires that a subsequent habeas petition raising the same issues be denied on the ground of

procedural default.

### 1.        Consistent Application and Waiver

Petitioner raises two issues in response that can be addressed summarily.  First, he

contends that the state court did not base its decision on an "adequate" state ground, because the

procedural rule set forth in § 33E has not been "regularly or consistently applied by the state

courts."   As support for that proposition, he cites the earlier First Circuit case of *Pina v.

Maloney*, 565 F.3d 48 (1st Cir. 2009), which held that the procedural rule relied upon—the

requirement that ineffective assistance claims be raised on direct appeal—had not been regularly

and consistently applied by the Massachusetts courts.  However, as the First Circuit noted in

*Mendes*, "*Pina* . . . is not controlling in Section 33E cases, like this one."  *Mendes*, 656 F.3d at

128.

Petitioner next contends that even if a finding by a gatekeeper justice under § 33E that

the petition presents no new and substantial issues generally operates as a procedural bar to

federal habeas review, the Commonwealth has waived the right to advance such an argument.  It

appears that the Commonwealth did not contend during the state-court adjudication of the new-

trial motion that petitioner's claims were procedurally defaulted.  Nonetheless, that does not

foreclose the Commonwealth from making the argument here.  The ruling of the single

gatekeeper justice is a ruling by the Commonwealth's highest court, and must be considered whether or not the Commonwealth raised the argument at that stage.

### 2. "New" and "Substantial" Claims Generally

The Court will therefore consider whether the "gatekeeper" determination by the single justice denying relief constituted an adequate and independent state-law ground precluding federal habeas relief. That question is considerably complicated by the First Circuit's decisions in *Mendes* and *Costa*, which seem to point in different directions.

In both *Mendes* and *Costa*, the petitioner asserted federal claims for the first time in a motion for post-conviction relief, after the SJC had decided the direct appeal. *Mendes*, 656 F.3d at 127; *Costa*, 673 F.3d at 19. When those motions for relief were denied, both petitioners requested leave to appeal under § 33E. However, the gatekeeper justices denied leave because the claims were not "new." *Mendes*, 656 F.3d at 128; *Costa*, 673 F.3d at 24. Not only could defendants have raised their claims of ineffective assistance of counsel on direct appeal, but there were issues underlying those claims that had been addressed at trial and on direct appeal. *See Mendes*, 656 F.3d at 127, 130; *Costa*, 673 F.3d at 19 ("[U]nderlying [petitioner's] ineffective assistance of counsel claims was an argument about [an eyewitness's] credibility, an issue well-covered at both of [petitioner's] trials and respective appeals.").

Despite their similar factual underpinnings, the opinions in *Mendes* and *Costa* describe somewhat differently the scope of the procedural-default effect of § 33E. In *Mendes*, the First Circuit explained that under the procedure established by § 33E, "a single judge acts as gatekeeper to bar access to the full court on any issue that could have been raised at the time of direct appeal, unless (as a general rule) the relief is sought on a basis that is *both* new (in the

sense of having been unavailable at the time of direct appeal) *and* substantial." *Mendes*, 656

F.3d at 128 (emphasis added). The court went on to describe the district court's denial of habeas

relief as having "rested on a procedural basis in state law (the gatekeeper's finding of failure to

raise the claim on direct appeal) that was independent of the federal right and adequate to bar

further relief." *Id.*

In *Costa*, however, the court swept more broadly, stating that a gatekeeper justice's

finding that a claim is "not new" and a finding that a claim is "not substantial" *each* "constitutes

an independent and adequate state ground in and of itself and acts to bar federal review." *Costa*,

673 F.3d at 24. Thus, read literally, a gatekeeper justice's determination that a claim was not

"new" would be enough, standing alone, to find a procedural default. That conclusion would

restrict significantly the ability of state-court "capital" defendants to obtain federal habeas

review. It would also create at least two serious problems.

The first problem originates in the two senses of the word "new" under the statute.

Under Massachusetts law, a claim is not "new" within the meaning of § 33E "where it has

already been addressed, or where it could have been addressed had the defendant properly raised

it at trial or on direct review." *Commonwealth v. Gunter*, 459 Mass. 480, 487 (2011) (quoting

*Commonwealth v. Pisa*, 384 Mass. 362, 365-66 (1981)). In other words, an issue raised in a

gatekeeper petition might not be "new" because (1) the petitioner raised it on direct appeal (and

therefore the gatekeeper justice would deny the petition because the SJC had already decided the

issue) or (2) the petitioner could have raised it on direct appeal, but failed to do so (and therefore

the gatekeeper justice would deny the petition because the petitioner had procedurally defaulted).

The second circumstance is a procedural default; the first is not.

*Costa*'s plain language could be read to sweep both categories of claims that are not "new" into the procedural-default box. However, the Court does not interpret *Costa* as establishing a rule that a petitioner in state custody is foreclosed from seeking habeas relief when the SJC determines that his gatekeeper petition did not raise a "new" issue because the issues raised in it were already addressed on direct appeal. It is certainly sensible, as this Court reads *Costa* (and *Mendes*) to hold, that a petitioner should be foreclosed from raising claims of which he should have been aware, yet did not preserve, in state post-trial proceedings. But when a claim in a § 33E petition is not "new" simply because the SJC already addressed it, there should be no procedural bar to raising it on federal habeas review. *See Mendes*, 656 F.3d at 128 (defining "new" as "having been unavailable at the time of direct appeal"). Otherwise, a petitioner who was unsuccessful in raising an issue on direct appeal would be severely penalized—and for no obvious reason—for attempting to raise the same issue under § 33E.

The second problem arises out of the suggestion in *Costa* that a gatekeeper justice's finding that a claim is "not new" *and* a finding that a claim is "not substantial" *each* "constitutes an independent and adequate state ground in and of itself and acts to bar federal review." *Costa*, 673 F.3d at 24. If true, it would mean that a determination by a gatekeeper justice that an issue was "new" (in the sense that it could not have been raised before) but not "substantial" (because it was minor or unimportant) would be considered a procedural default, thus precluding federal habeas review.

When a habeas petitioner has "failed to meet the State's procedural requirements for presenting his federal claims," he "has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732. The procedural default rule, like

16

the requirement of exhaustion, protects the integrity of the underlying state rule and prevents the "'unseemliness' of a federal district court's overturning a state-court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)) (alternation omitted). However, when a gatekeeper justice denies full-court review of a claim solely because the claim is "not substantial," the petitioner has not deprived the state court of the opportunity to address the claim. Rather, the state has created a procedure whereby a single justice, rather than the entire court, may determine that the claim is without merit. In other words, a gatekeeper justice's determination that a claim is "new" but "not substantial" is a summary decision on the merits. And such a decision ought not to trigger the procedural-default rule.[2]

An additional reason to read *Costa* more narrowly is that the language that "not new" and "not substantial" are each an independent and adequate state ground appears to be dictum. The facts of *Costa* and *Mendes* are quite similar, and the actual holdings are as well: that a defendant

---

[2] It is true that the Supreme Court has found that a state procedural rule may count as an adequate and independent ground for denying federal habeas review even though the rule leaves the state court with some measure of discretion in applying the rule. *See Walker v. Martin*, 131 S. Ct. 1120 (2011); *Beard v. Kindler*, 558 U.S. 53 (2009).

*Walker*, however, dealt with a procedural rule that measured the timeliness of applications for state post-conviction relief by state judges' discretion as to reasonableness, rather than using fixed statutory deadlines. *See Walker*, 131 S. Ct. at 1125-26. *Beard* dealt with state judges' discretion to excuse a rule that an escaped felon forfeits post-conviction relief. *See Beard*, 558 U.S. at 58-60. The discretionary rules at issue in *Walker* and *Beard*, like the discretion reserved to a § 33E gatekeeper justice to determine whether a claim is "new," were efforts by the states to "preserve flexibility" as to "procedural errors." *Beard,* 558 U.S. at 61.

By contrast, a single justice's discretionary decision as to the substantiality of the claim itself—unlike discretion as to timeliness of the claim or discretion to excuse some fixed procedural bar to the claim—appears simply to be a summary decision on the merits.

who neglected to raise an available federal claim on direct appeal was procedurally barred from later asserting it on collateral review.

Accordingly, the Court will apply the procedural-default bar where the gatekeeper justice denied leave to appeal because the claim was "not new" because it could have been raised earlier but was not, but will not apply it where the claim is "not new" because it was raised on direct appeal or "new, but not substantial."

### 3. Whether Petitioner's Claims Are Procedurally Defaulted

Here, the gatekeeper justice gave no guidance as to why petitioner's claims were "not new," "not substantial," or both. The Court will therefore look to the record to determine the facts and procedural underpinnings of the ruling.

Here, as in *Costa*, the substantive allegations underlying petitioner's ineffective-assistance claim were known and partially raised and addressed on direct appeal. The Massachusetts Appeals Court and the SJC specifically reviewed the admissibility of the impeachment evidence that neither alibi witness had come forward to the police. In determining that the evidence was properly admitted, the SJC considered the fact that defense counsel did not object to its admission and the fact that counsel did not reveal to the judge the advice he had given the witnesses. Petitioner bases his ineffective-assistance claim on those decisions by counsel and the purported conflict of interest that led to them.

Under many circumstances, a petitioner could not effectively have raised an ineffective-assistance claim on direct appeal, because (1) the same counsel represented him on appeal, creating a potential conflict, and (2) appellate courts normally do not permit the introduction of new evidence and new claims. Here, however, petitioner had obtained new counsel by the time

of his direct appeal; indeed, the same counsel who handled that appeal filed the petition in this case. There was thus no issue of structural conflict arising out of the attorney-client relationship that would have prevented petitioner from raising an ineffective-assistance claim on direct appeal.

Furthermore, as a so-called "capital" defendant under § 33E, petitioner could have introduced new evidence and raised new claims in the SJC. As the First Circuit noted in *Mendes*:

> [T]he statute [§ 33E] not only authorizes the court to entertain motions for new trial (as for ineffective assistance) filed with it in the first instance, but gives the parties an opportunity to put in evidence supplementing the record at trial. *In a case like this one, for example, the ineffective assistance claim could have been filed along with the direct appeal, presented on the basis of an expanded record, and probably considered not on the more searching standard of professional adequacy, but simply on the likelihood of any influence on the jury's conclusion.* It is this distinct standard of review, relatively lenient toward defendants, that constitutes the quid pro quo . . . for the relatively narrow opportunity for appellate review of any subsequent claims for collateral relief on which a defendant fails to prevail in the trial court: the gatekeeper is there to bar the way to review on the merits of any claim not new and substantial.

656 F.3d at 129 (emphasis added). Petitioner thus was not limited on direct appeal to the issues raised in the trial court, or even the evidentiary record. The ineffective-assistance claim could have been raised and fully litigated in the SJC, and was not.[3]

In short, petitioner could have asserted his ineffective-assistance claim along with his challenge to the admissibility of evidence, on direct review. It was thus not "new" within the

---

[3] It is at least theoretically possible that the gatekeeper justice concluded that the ineffective-assistance claim was "new" (in the sense that it could not have been raised before) but not "substantial." Not until after the direct appeal did the Superior Court grant funds for a forensic expert who came to a conclusion that was favorable to petitioner. A possible argument could be made that only then did trial counsel's failure to conduct such testing earlier appear to be ineffective assistance of counsel, but that this failure was not so "substantial" as to deprive petitioner of his Sixth Amendment right. However, the lack of forensic testing was a fact known on direct appeal. The more plausible reading of the gatekeeper justice's denial therefore remains that the issue was not "new" because it should have been raised before, but was not.

meaning of § 33E, in the sense that petitioner had a prior opportunity to raise the claim on direct appeal but did not. Therefore, petitioner has procedurally defaulted on that claim.

A procedural default may be overcome if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Neither showing has been made here. At most, the failure to raise the issue under ch. 278, § 33E in the direct appeal was attorney error. But mere attorney error, not amounting to ineffective assistance in a constitutional sense, is not enough to constitute cause. *Burks*, 55 F.3d at 717. Nor has petitioner demonstrated that a fundamental miscarriage of justice will result. Accordingly, the claim of ineffective assistance of counsel is barred by the procedural default rule.

However, petitioner's Sixth and Fourteenth Amendment claims based on the court's denial of funds for forensic investigation in support of his new-trial motion were undoubtedly "new" in the sense that they were not available before the new-trial motion was argued. Therefore, the gatekeeper justice must have determined that these claims were "not substantial." For the reasons stated above, those claims are not barred by procedural default and may be considered here. Finally, petitioner's due-process and equal-protection challenges to the gatekeeper procedure of § 33E itself will be addressed on the merits.

### C.    Denial of Funds for Forensic Investigation

Petitioner contends that the denial of funds for forensic investigation violated his Sixth Amendment right to counsel (as well as his Fourteenth Amendment right to due process because

it violated his state right to counsel).[4]

Both the Massachusetts Constitution and the United States Constitution impose a duty on defense counsel to "conduct an independent investigation of the facts, including an investigation of the forensic, medical, or scientific evidence." *Commonwealth v. Baker*, 440 Mass. 519, 529 (2003) (citing *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974) and *Strickland v. Washington*, 466 U.S. 668, 690 (1984)).[5] Petitioner contends that by denying his request for post-conviction discovery funds, the court effectively deprived him of his right to effective assistance of counsel.

An indigent defendant generally has no constitutional right to an attorney for the purposes of a new-trial motion. *Coleman*, 501 U.S. at 752 (holding that generally "[t]here is no constitutional right to an attorney in state postconviction proceedings"). Indeed, an indigent defendant has only a limited right to state funds for investigation at any stage of the trial. *See United States v. De Jesus*, 211 F.3d 153, 156 (1st Cir. 2000). Furthermore, 28 U.S.C. § 2254(i) specifically provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings [such as a motion for a new trial] shall not be a ground for relief in a proceeding arising under section 2254." Consequently, even if the Court found that the state court's denial of *additional* funds to perform forensic investigation for the purposes of a new trial hearing denied him effective assistance of counsel at that hearing, he

---

[4] It is well-established, and undisputed, that Fourteenth Amendment due process implicates a criminal defendant's state-law right to counsel. Therefore, this Court will proceed directly to the issue of whether the denial of funds for forensic investigation violated petitioner's right to counsel under either the Sixth Amendment or the Massachusetts Constitution.

[5] In its order denying respondent's motion to dismiss, this Court held that the ineffective-assistance analysis is "essentially equivalent under state and federal constitutional law." As the Court cannot on habeas review overturn a state court on its interpretation of its state's constitution, the foregoing analysis will be confined to the federal constitutional standard.

would not be entitled to habeas relief on that basis. Accordingly, petitioner's claim that the state court's denial of funds violated his federal right to counsel and right to due process when there is state right to counsel will be denied.

### D. Procedure under Mass. Gen. Laws ch. 278, § 33E

#### 1. Due Process Challenge

It is well-established that the Due Process Clause does not require the state to provide a criminal defendant with any significant level of appellate process at all, let alone the review by a three-judge panel to which petitioner contends he has a right. *Ross v. Moffitt*, 417 U.S. 600, 611 (1974) ("[W]hile no one would agree that the State may simply dispense with the trial stage of proceedings without a criminal defendant's consent, it is clear that the State need not provide any appeal at all."). When an appeal has been provided, as in Massachusetts, "[u]nfairness results only if [a particular class of defendants] are singled out by the State and denied meaningful access to the appellate system because of their [membership in that class]" in violation of the Equal Protection Clause. Accordingly, the Court will not grant habeas relief on the basis of the petitioner's Due Process Clause challenge to the Massachusetts statutory scheme for criminal appeals.

#### 2. Equal Protection Challenge

In *Dickerson v. Latessa,* the First Circuit, facing precisely the same issue now before the Court, definitively held that "section 33E's gatekeeper provision does not deny [a capital defendant] the equal protection of the laws." 872 F.2d at 1121. The Court can find no relevant distinction between petitioner's equal protection challenge to the Massachusetts statutory scheme and the arguments rejected by the First Circuit in *Dickerson*. Accordingly, the Court

will not grant habeas relief on the basis of the petitioner's Equal Protection Clause challenge to the Massachusetts statutory scheme for criminal appeals.

**IV.**    <u>**Conclusion**</u>

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**


<u>/s/ F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated: April 15, 2014                                   United States District Judge